**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KEITH BURNS,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,<br><br>        Defendant. | CASE NO. 5:24-CV-01032-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff ("Plaintiff" or "Mr. Burns") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)

For the reasons set forth below, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should: consider the entire record, including both objective and non-objective evidence; accurately discuss the evidence; clearly articulate the rationale for his RFC findings and subjective symptom analysis; and ensure that his stated rationale builds an accurate and logical bridge between the evidence and the result.

## I.    Procedural History

On October 19, 2021, Mr. Burns filed applications for DIB and SSI, alleging a disability onset date of October 13, 2020.  (Tr. 76, 84.)  He alleged disability due to spinal deterioration.  (Tr. 69, 77.)  His applications were denied at the initial level (Tr. 76, 84) and upon reconsideration (Tr. 85, 93), and he requested a hearing (Tr. 127).  On March 30, 2023, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 32-68.)  On May 24, 2023, the ALJ issued a decision finding Mr. Burns has not been under a disability within the meaning of the Social Security Act from October 13, 2020, through the date of the decision.  (Tr. 12-29.)  Mr. Burns sought review of the decision by the Appeals Council.  (Tr. 202-03.)  On April 16, 2024, the Appeals Council found no reason to review the decision, making the decision the final decision of the Commissioner.  (Tr. 1.)  Mr. Burns filed a Complaint challenging the decision on June 19, 2024 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 11, 13).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Burns was born in 1976 and was 43 years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date.  (Tr. 69, 77.)  He did not complete high school.  (Tr. 245.)  Mr. Burns has not worked since October 13, 2020, the alleged onset date.  (Tr. 69, 77.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

On February 21, 2020, Mr. Burns presented to the Aultman Hospital emergency room complaining of diffuse, intractable, cramping/spastic abdominal and back pain.  (Tr. 314.)  He was admitted for further evaluation.  (Tr. 335.)  Transthoracic echocardiography (Tr. 340-43)

and chest x-rays (Tr. 355-57) were normal. MRI imaging of the lumbar spine showed "very mild lower lumbar degenerative changes" and no stenosis. (Tr. 358.) MRI imaging of the thoracic spine revealed discitis at T8-T9 with irregular endplate destruction, 2.5 cm paraspinous fluid collection, and mild infiltration into the paraspinous fat at the disc space level. (Tr. 330, 359.) An aspiration biopsy of the thoracic spine showed Streptococcus osteomyelitis. (Tr. 315, 351-52.) An x-ray of the thoracic spine showed a mild wedge deformity in the midthoracic spine (Tr. 356), and an x-ray of the lumbar spine showed very mild lower lumbar degenerative changes (Tr. 358). Mr. Burns received antibiotics through a peripherally inserted central catheter ("PICC") during his hospital stay. (Tr. 315, 360-63.) He was discharged on February 26, 2020 with home health care for the further administration of intravenous ("IV") antibiotics and prescriptions for Percocet, docusate-senna, gabapentin, naproxen, oxycodone, and polyethylene glycol. (Tr. 315.)

On March 31, 2020, Mr. Burns sought follow-up treatment for osteomyelitis with Badie Al Nemr, M.D., at Premier Specialists in Infectious Disease in Canton, Ohio. (Tr. 428-29.) It was a telehealth visit, so no physical examination took place. (Tr. 429.) Mr. Burns reported symptoms including pain, chills, restricted movement, swelling and redness, weight loss, weakness, and malaise, which he described as "mild and improving." (Tr. 428.) He also reported significant improvement in his back pain during his six weeks of IV antibiotics. (Tr. 429.) Dr. Nemr did not change Mr. Burns's prescribed medications and ordered a follow-up MRI of the thoracic spine in three months. (*Id.*)

The July 6, 2020 MRI showed: interval improvement of the discitis osteomyelitis at the T8-T9 vertebral bodies/intervertebral disc space; kyphotic angulation at T8-9 secondary to increased height loss of T8 and T9 with associated 2mm of retropulsion most pronounced to the right of midline; and new osteomyelitis at the spinous process of T7 and progression at the

spinous process of T8 and T9. (Tr. 443.) Mr. Burns attended a telehealth visit with Dr. Nemr on

July 9, 2020, where he complained of pain, chills, restricted movement, swelling and redness,

weight loss, weakness, and malaise, which he described as "mild and improving"; he reported

that his back pain was at a two instead of a ten. (Tr. 426-27.) Dr. Nemr noted the MRI results

and referred Mr. Burns to a spine surgeon due to new osteomyelitis found at T7. (Tr. 427.)

On July 28, 2020, Mr. Burns presented to neurosurgeon Rishi K. Goel, MD, at Aultman

Neurosurgery in Canton. (Tr. 476-80.) He complained of ongoing back pain from his spine

infections, worse in the morning. (Tr. 476.) He described the pain as an inconvenience and said

he could not lift more than 40 pounds. (*Id.*) He was told he could return to work. (*Id.*) On

physical examination, Mr. Burns used no assistive device and had no neurological deficits, a

normal gait, and full strength in both lower extremities. (Tr. 479.) Dr. Goel told Mr. Burns that

he was a candidate for spinal fusion surgery due to the angulation of his spine. (Tr. 476.) Mr.

Burns declined to move forward with surgery at that time, and Dr. Goel ordered x-rays of the

lumbar spine in two months and a follow-up appointment. (*Id.*)

Mr. Burns attended a telephonic visit with Dr. Nemr on August 18, 2020, where he

continued to complain of thoracic back pain. (Tr. 424-25.) Dr. Nemr noted no significant

changes but ordered new MRIs of the thoracic and lumbar spines. (Tr. 425.) He made no

changes to Mr. Burns's active medications, which included Percocet, gabapentin, naproxen, and

prescription-strength ibuprofen. (Tr. 424.)

On September 18, 2020, Mr. Burns underwent repeat MRIs. (Tr. 439-42; *see also* 561-

64.) Imaging of the thoracic spine showed: redemonstrated discitis osteomyelitis of the T8 and

T9 vertebral bodies and intervening disc space, with interval slight decreased marrow edema in

the T8 and T9 vertebral bodies and intervening disc space; unchanged severe height loss of the

T8 and T9 vertebral bodies; unchanged hyperintense signal on STIR of the T7 and T8 spinous processes; and unchanged vertebral and bilateral paraspinal edema at T8 and T9.  (Tr. 439-40.) Imaging of the lumbar spine showed: no evidence of osteomyelitis discitis; interval increased degenerative spondylolisthesis of L4 relative to L5 and disc height loss; moderate central canal stenosis; and interval mild increased disc height loss at L3-L4.  (Tr. 441-42).

Mr. Burns returned to see Dr. Goel on September 29, 2020.  (Tr. 471-474.)  He reported right leg pain that was worse when walking, pain between the shoulder blades, and difficulty bending over or standing up straight.  (Tr. 471.)  He said he required pain medication to get out of bed in the morning and had a "hunched over posture."  (*Id.*)  Dr. Goel advised that this was likely his "new normal."  (*Id.*)  On examination, Mr. Burns did not use an assistive device and had no neurological deficits, a normal gait, and full strength in his lower extremities.  (Tr. 472-73.)  Dr. Goel reviewed the recent MRIs and diagnosed discitis and lumbar stenosis.  (Tr. 471, 473.)  He started Mr. Burns on conservative treatment options, including medication and physical therapy.  (Tr. 473.)  He noted that Mr. Burns was not a candidate for steroids due to his history of discitis but was a candidate for surgery.  (Tr. 471-72.)  He prescribed gabapentin and tizanidine and ordered an x-ray of the lumbar spine with a follow-up in one month.  (Tr. 472.)

On October 1, 2020, Mr. Burn attended an appointment with Dr. Nemr in person and continued to report back pain.  (Tr. 421-23.)  On physical examination, he was in no acute distress and had lumbar tenderness on palpation.  (Tr. 422.)  Dr. Nemr noted discitis of T8 and T9 as shown in the September MRI and ordered aspiration of T8 and T9 with pathology of cultures and follow up in four weeks to assess the need for further antibiotics.  (Tr. 423).

At an October 15, 2020 appointment, Dr. Nemr noted that the cultures showed a staph infection and ordered a PICC line to start six weeks of IV Vancomycin.  (Tr. 419.)  On October

5

27, 2020, Mr. Burns called Dr. Nemr's office with leg pain and varicose veins.  (*Id.*)  It was recommended he that visit the ER and follow up with his care team.  (*Id.*)  At an October 29 follow-up appointment, Mr. Burns reported chronic but stable back pain and right leg pain.  (Tr. 418.)  Dr. Nemr extended the IV medications prescription to eight weeks.  (*Id.*)

Also on October 29, 2020, Mr. Burns attended a follow-up appointment with Dr. Goel. (Tr. 467-69.)  He reported difficulty bending over and standing up straight, as well as right leg pain.  (Tr. 467.)  He also informed Dr. Goel he had a PICC line in place due to a staph infection in his back.  (*Id.*)  On examination, Mr. Burns did not use an assistive device and had no neurological deficits, a normal gait, and full strength in his lower extremities.  (Tr. 468-69.)  Dr. Goel advised Mr. Burns that they could not proceed with surgery until his infection cleared up and ordered a follow-up in two months.  (Tr. 467.)

Mr. Burns attended a telehealth appointment with Dr. Nemr on January 19, 2021.  (Tr. 413-14).  At that time, he had completed an eight-week course of antibiotics, and his back pain was improving.  (Tr. 414).  Dr. Nemr found no neurological deficits on examination and ordered repeat MRIs in a couple of months.  (*Id.*)

Mr. Burns next saw Dr. Goel again on March 2, 2021, when he complained of low back pain when bending forward and trouble walking due his legs "locking up."  (Tr. 461; *see also* 634.)  He also described bilateral leg pain primarily in the right leg that felt like "ripping" in the back of his calf and knee.  (Tr. 461.)  On examination, he did not use an assistive device and had no neurological deficits, a normal gait, and full strength in his lower extremities.  (Tr. 464.)  Dr. Goel renewed prescriptions for gabapentin and naproxen, gave a referral to pain management, ordered x-rays of the lumbar spine, and ordered a follow-up after upcoming MRIs.  (*Id.*)

A March 22, 2021 MRI of the thoracic spine showed: interval decreased prevertebral and paraspinal enhancement at T7-T9 debris in the sequela of osteomyelitis discitis; interval absent disc space at T8-T9; and unchanged vertebral body height loss with anterior wedging and associated mild kyphosis.  (Tr. 488-89.)  An MRI of the lumbar spine on that same date showed: no evidence of discitis osteomyelitis; and moderate central canal stenosis, bilateral lateral recess narrowing, and moderate left and mild to moderate right foraminal narrowing at L4-L5.  (Tr. 486-87.)  Dr. Nemr discussed the MRI results with Mr. Burns on March 24, 2021, informing him there were "no signs of acute infection and previous infection signs ha[d] improved."  (Tr. 412.)  Dr. Nemr referred Mr. Burns back to Dr. Goel for treatment of his spinal stenosis.  (*Id.*)

On March 25, 2021, Mr. Burns attended a follow-up with Dr. Goel.  (Tr. 456-60; *see also* 641-45.)  He complained of upper back pain radiating down both legs with some numbness.  (Tr. 456.)  Examination findings were unremarkable, and Mr. Burns did not use an assistive device.  (Tr. 457-58.)  Dr. Goel confirmed the recent MRIs showed no further evidence of spinal infection.  (Tr. 456.)  Based on the imaging, he diagnosed lumbar stenosis and ordered an open lumbar laminectomy with bilateral foraminotomies and posterior lateral fusion.  (*Id.*)

Mr. Burns saw Dr. Goel again on October 14, 2021.  (Tr. 451-55; *see also* 646-50.)  He endorsed lower back pain radiating into his legs, with cramping, and noted relief when leaning forward.  (Tr. 451.)  He also reported buckling and weakness in his legs that was worse in the morning.  (*Id.*)  His physical examination was normal, and he was not using an assistive device.  (Tr. 452.)  Dr. Goel reviewed lumbar x-rays from March 22, 2021, and found that they showed instability at the L4-L5 level with a spondylolisthesis of 7mm in a neutral position that reduced to 3mm with extension.  (Tr. 451.)  He continued to diagnose lumbar stenosis.  (*Id.*)

At his pre-surgical appointment in early November 2021, Mr. Burns continued have a normal gait and to walk unassisted. (Tr. 500.) On November 10, 2021, he underwent open lumbar laminectomy with bilateral foraminotomies and posterior lateral fusion and pedicle screw fixation with Dr. Goel. (Tr. 666.) Postoperatively, he reported improved pain but also muscle spasms that caused increased pain in his back radiating into his right hip. (*Id.*) A dose of valium and repositioning helped the muscle spasms. (*Id.*) Mr. Burns denied numbness, tingling, and new weakness. (*Id.*) His dorsiflexion and plantar flexion were strong, and he could lift both legs off the bed without difficulty. (*Id.*) He was discharged on November 12, 2021, with a prescription for naproxen and instructions to wear a back brace when out of bed. (Tr. 666-67.)

Mr. Burns attended a post-surgical follow-up with Dr. Goel on November 30, 2021. (Tr. 624-27; *see also* 651-55.) He was not wearing his back brace, saying it was uncomfortable. (Tr. 624.) He reported that his legs were feeling better since the surgery and no longer "locking up" but also stated that he had "bone pain" during the night without numbness, tingling, weakness, or shooting pains. (*Id.*) He had normal gait, sensation, and leg strength on examination, and did not use an assistive device. (Tr. 625.) Dr. Goel recommended that Mr. Burns continue taking tizanidine and gabapentin and follow up in three months. (Tr. 624.)

On February 1, 2022, Mr. Burns underwent post-surgical x-rays of his lumbar spine. (Tr. 665.) The x-ray showed "no acute process" and "expected postoperative change." (*Id.*) On that same date, Mr. Burns presented to Dr. Goel and reported that he felt the surgery was beneficial in alleviating his leg pain. (Tr. 628; *see also* 655.) Examination findings were unremarkable, with Mr. Burns using no assistive device and having a normal gait, intact strength, and no neurological deficits. (Tr. 628-29.) Dr. Goel noted that Mr. Burns's most recent lumbar spine x-rays "looked good" and found no need for further follow up at that time. (Tr. 628.)

8

On October 13, 2022, Mr. Burns returned to see Dr. Goel with complaints of low back pain radiating down his left leg to his knee, associated numbness, and weakness in both legs. (Tr. 718.)  His symptoms had been getting worse for the previous three months.  (*Id.*)  Mr. Burns told Dr. Goel that he had an order for physical therapy, but they would not proceed until he saw Dr. Goel.  (*Id.*; *see* Tr. 795.)  Dr. Goel prescribed naproxen and tizanidine to "avoid surgery at this time," and recommended that Mr. Burns use the TENS unit he had at home.   (Tr. 718.)  Dr. Goel explained that another fusion surgery at that time would "start a domino effect and [Mr. Burns] w[ould] likely require further fusions in the future."  (*Id*.)  Dr. Goel advised Mr. Burns to try the conservative treatments for two weeks; if they were ineffective, he would schedule a CT and myelogram.  (*Id.*)  Dr. Goel further advised that Mr. Burns "hold off" on physical therapy until he saw how the oral medication helped.  (*Id.*)  On examination, Mr. Burns did not use an assistive device and had a normal gait, full leg strength, and no neurological deficits.  (Tr. 719.)

Mr. Burns followed-up with Dr. Goel on October 27, 2022.  (Tr. 805-08.)  After two weeks on naproxen and tizanidine, he continued to report unchanged low back pain radiating to the left leg with numbness, tingling, and weakness.  (Tr. 805.)  Cold weather made the pain worse.  (*Id.*)  Dr. Goel and Mr. Burns "discussed an intrathecal pain pump trial in detail," but Mr. Burns wanted to discuss it with his fiancée before proceeding.  (*Id.*)  Dr. Goel continued his medications, referred him to a pain management specialist and provided him with a one-month work excuse letter.  (Tr. 805, 807.)  On examination, Mr. Burns did not use an assistive device, and continued to have a normal gait, full leg strength, and no neurological deficits.  (Tr. 806.)

2.      **Opinion Evidence**

i.      **Consultative Examiner**

On February 12, 2022, Mr. Burns underwent a consultative examination with Christopher D'Amico, D.O.  (Tr. 810-19.)  He reported 7/10 thoracic and leg pain with standing, walking, and bending.  (Tr. 810.)  His symptoms improved when sitting forward.  (*Id.*)  His also reported daily activities including housework, yardwork, shopping, doing laundry, and driving.  (Tr. 811.)

Mr. Burns arrived at the examination with a cane, but he could walk around the exam room without it and maintained a steady and symmetric gait.  (Tr. 813.).  Dr. D'Amico felt the cane was used as "a security object," noting that Mr. Burns indicated he mostly used the cane to bend over and pick up things.  (Tr. 814.)

On examination, Mr. Burns was alert and fully oriented and had normal thought processes, memory, and concentration; he had a negative straight leg test bilaterally while sitting, and a positive straight leg test at 50 degrees while supine; he was able to lift, carry, and handle light objects; he demonstrated grossly normal fine and gross manipulative abilities; he could squat and rise with moderate difficulty and rise from sitting without assistance; he had moderate difficulty getting up and down from the exam table and had moderate difficulty walking on heels and toes; he could not hop on one foot.  (Tr. 813-14.)  He had reduced range of motion in his back (Tr. 815-16) but intact strength and sensation (Tr. 818-19).

Dr. D'Amico concluded that Mr. Burns's musculoskeletal limitations and thoracic pain were "secondary to discitis and residual bone loss with lumbar stenosis and bilateral sciatica." (Tr. 814.)  He opined that Mr. Burns: had moderate limitations with sitting and severe limitations with standing and walking; needed an assistive device (cane) for short and long distances and

uneven terrain; had severe limitations lifting and carrying weight; could never bend, stoop, crouch, or squat; and could frequently reach, grasp, handle, finger, and feel.  (*Id.*)

### ii.     Physical Work Performance Evaluation

On January 17, 2023, Mr. Burns underwent a physical work performance evaluation with Marykay Barnes, M.Ed., OTR/L, at Aultman North Therapy Services.  (Tr. 823-25.)  During the evaluation, Mr. Burns: demonstrated functional hand grip; had difficulty maintaining a static position; was unable to sustain trunk flexion; had decreased box control, decreased balance, and decreased lower extremity strength; and had back and leg pain and shortness of breath.  (Tr. 824-25.)  OT Barnes recommended physical therapy to address back/leg pain, decreased balance, and lower extremity weakness.  (Tr. 825.)

Regarding Mr. Burns's functional capacity, OT Barnes opined that he could: occasionally lift up to 26 pounds and carry up to 15 pounds; occasionally push 20 pounds and pull 115 pounds; occasionally sit, stand, work with his arms overhead, kneel, climb stairs, squat, walk, crawl, and engage in repetitive trunk rotation standing or sitting; and never squat/crouch, climb ladders, or work bent over while stooping or sitting.  (*Id.*)  She further opined that Mr. Burns could perform work at the light level as defined in the Dictionary of Occupational Titles ("DOT").  (Tr. 824.)  She noted however, that it was "difficult to predict" if he could sustain light work for an 8-hour day "due to his performance decreasing by 20% after 3 hours of light work," opining that he "may be able to sustain sedentary level of work for an 8-hour day."  (*Id.*)

### iii.    State Agency Medical Consultants

On March 1, 2022, Maria Congbalay, M.D., completed a physical residual functional capacity ("RFC") assessment.  (Tr. 72-73, 80-81.)  She opined that Mr. Burns could: occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; stand,

walk, or sit for up to 6 hours in an 8 hour workday; push/pull with upper and lower extremities with no limitations; occasionally stoop, crouch, crawl, and climb ramps or stairs; never climb ladders, ropes, or scaffolds; and frequently balance and kneel.  (*Id.*)  She found that Mr. Burns had no manipulative, visual, or communicative limitations but should avoid even moderate exposure to hazards, particularly uneven terrain, unprotected heights, dangerous machines, and commercial driving.  (Tr. 73, 81.)  In so finding, Dr. Congbalay noted that: Mr. Burns's physical exams showed full strength and normal gait; and he used a cane for security, but it was not medically necessary.  (Tr. 72, 80.)

On reconsideration, on June 8, 2022, Gail Mutchler, M.D., affirmed most of Dr. Congbalay's findings (Tr. 89-91, 97-99), except that she found Mr. Burns could frequently (rather than occasionally) crawl (Tr. 90, 98).

## C.   Hearing Testimony

### 1.   Plaintiff's Testimony

At the hearing on March 30, 2023, Plaintiff testified in response to questions from the ALJ and his attorney.  (Tr. 32-68.)  He testified that he lived with his fiancé in a rental home, and his fiancé worked.  (Tr. 41.)  He had a driver's license and was able to drive for 20-30 minutes before he had to stand up and move around.  (Tr. 41-42.)  He could then continue to drive for a little while.  (Tr. 42.)  Sitting or standing for too long caused pulsating and aching pain throughout his body, but changing positions helped somewhat.  (*Id.*)

In February 2020, Mr. Burns had surgery to address an infection in his spine; afterwards, he required a PICC line for 24 weeks.  (Tr. 47-48.)  He was unable to return to his previous work after this surgery, but his employer continued paying him throughout most of 2020.  (Tr. 48-49.)

12

In October 2020, the employer informed Mr. Burns they could not keep paying him, and they "cut ties." (Tr. 49.)

Mr. Burns testified that he was working for a landscaping company, rendering drawings for the crews to use as guides for specific jobs. (Tr. 42-43.) He also completed paperwork at times. (Tr. 43.) Mr. Burns's friend owned the company and allowed Mr. Burns to work when he could, and to do only what he felt able to do; Mr. Burns worked for his friend 20-27 hours a week. (*Id.*) This friend paid Mr. Burns $20 an hour and sometimes paid him for hours he did not work. (*Id.*) Mr. Burns testified that his friend did all his own drawings, and Mr. Burns's work was "just lightening his load so he could be more hands on." (Tr. 44.) The friend knew that sometimes Mr. Burns might not show up for work, but he wanted to help Mr. Burns. (*Id.*) Mr. Burns said he did not earn the money his friend paid him. (*Id.*)

Mr. Burns testified that he had pain through his whole back, from the base of his neck to his waistline, and pain that shot down his right (and sometimes left) leg. (Tr. 46.) He occasionally had varicose veins pop out of his leg while walking, after which he would need to sit or stop and balance with his cane. (*Id.*) His back pain was constant, and his leg pain came out of nowhere three or four days a week. (Tr. 46-47.) Before his fusion surgery, his leg pain was constant. (*Id.*)

Mr. Burns testified that he was in about the same place functionally as he had been prior to his fusion surgery in 2021. (Tr. 50.) The only difference was that his leg did not bother him as much as it did before the surgery. (*Id.*) Mr. Burns could normally stand or walk about ten minutes at a time before needing to sit down for about five minutes due to throbbing pain. (*Id.*) He could only sit for 20-30 minutes before needing to stand, walk around, and stretch for 5-10 minutes. (Tr. 51, 57-58.) He also could not lay in bed comfortably and normally slept in a

recliner.  (Tr. 51.)  He could sleep for an hour at a time in the recliner but would wake up feeling like he was going to roll off.  (*Id.*)  He slept about four hours per night, in one-hour stretches. (*Id.*)  His recliner was the type that would push him up and out of the chair.  (Tr. 57.)

Mr. Burns testified a physical therapist instructed him not to lift more than 20 pounds. (Tr. 51.)  He felt like he could not lift more than 20 pounds.  (Tr. 52.)  He did not like to carry anything.  (*Id.*)  The most he would carry was a gallon of milk in one hand and a small bag of groceries in the other—maybe at most eight pounds.  (*Id.*)

Mr. Burns used a claw grabber to pick up or grab things.  (*Id.*)  He had a cane with him at the hearing and said he used the cane all the time and did not go anywhere without it, including doctor's appointments.  (Tr. 53.)  When he went grocery shopping, he explained that he put his small grocery bag over the cane handle to carry it.  (*Id.*)  Normally, he did not go grocery shopping.  (*Id.*)  When he did, he did not go to a place like Walmart.  (*Id.*)  Instead, he went to a Dollar General.  (Tr. 53-54.)  His fiancé did most of the grocery shopping.  (Tr. 54.)

Mr. Burns also used a back brace.  (Tr. 52.)  He wore it "all the time" to help him be able to sit for longer periods.  (Tr. 58.)  He was prescribed gabapentin, naproxen, and tizanidine but said he was not currently getting any of them due to issues with his prescription refills.  (Tr. 58-59.)  He had been without tizanidine and naproxen about two weeks and was almost out of gabapentin; he needed to make an appointment for new prescriptions.  (Tr. 59.)

Mr. Burns sought treatment for his back and leg pain at My Community Health and at Aultman Hospital.  (*Id.*)  He had been seeing different doctors at My Community Health for about two years, and they referred him to his surgeon Dr. Goel.  (Tr. 54-55.)  Dr. Goel had suggested treating Mr. Burn's pain with a device that automatically provided small morphine doses throughout the day, but it was ruled out due to his history of infections.  (Tr. 55.)  Dr. Goel

14

also suggested another fusion surgery.  (*Id.*)  At My Community Health, they gave Mr. Burns a spinal block epidural injection a week before the hearing, but he had passed out during the procedure and was in more pain afterwards.  (Tr. 55-56.)

Regarding his activities of daily living, Mr. Burns testified that he had problems with household chores and yardwork.  (Tr. 60.)  He could not vacuum long because it required standing and motion.  (*Id.*)  He would dust a little bit when he got up to move around, but he did not do laundry or dishes.  (Tr. 60-61.)  He was able to eat and care for his personal hygiene unassisted.  (Tr. 61.)  Due to his condition, Mr. Burns was not able to focus as he used to.  (*Id.*)

## 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, limited to a range of sedentary work with the functional limitations described in the ALJ's RFC determination could not perform Plaintiff's prior work, but could perform representative positions in the national economy, including order clerk, document preparer, and telephone quotation clerk.  (Tr. 62-64.)  The VE further testified that there would be no competitive employment available for that hypothetical individual if he needed to stand and move around for 5-10 minutes every 20 minutes, would be off task more than 10% of the workday, or would be absent more than six days per year.  (Tr. 66-67.)

## III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920[1]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

### IV.    The ALJ's Decision

In his May 24, 2023 decision, the ALJ made the following findings:[2]

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.  (Tr. 17.)

2.    The claimant has not engaged in substantial gainful activity since October 13, 2020, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: degenerative disc disease of the thoracic and lumbar spine, discitis of the thoracic spine, and obesity.  (Tr. 18.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following additional limitations. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl. The claimant can frequently balance. The claimant cannot work near hazards, such as unprotected heights, dangerous moving machinery, and the performance of occupational driving.  (Tr. 19.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 22.)

7.    The claimant was born in 1976 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 23.)

8.    The claimant has a limited education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including order clerk, document preparer, and telephone quotation clerk.  (*Id.*)

---

[2] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 13, 2020, through the date of the decision on May 24, 2023.  (Tr. 24.)

## V.      Plaintiff's Arguments

In his sole assignment of error, Mr. Burns argues that the ALJ's RFC was not supported by substantial evidence because: (1) the ALJ failed to consider evidence that suggests a greater level of impairment; and (2) the ALJ failed to adequately assess Plaintiff's credibility.  (ECF Doc. 11, pp. 14-26.)

## VI.      Law & Analysis

## A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

18

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The RFC Was Not Supported by Substantial Evidence**

Mr. Burns makes two substantive arguments in support of his sole assignment of error, that the RFC lacks the support of substantial evidence.  First, he argues that the ALJ failed to consider evidence supporting a greater degree of impairment.  (ECF Doc. 11, pp. 14-21.) Second, he argues that the ALJ failed to adequately evaluate the credibility of his subjective

complaints of pain because he did not address "a large portion of relevant and compelling evidence that supports Plaintiff's allegations." (*Id.* at pp. 21-26.)  The Commissioner responds that the ALJ adequately considered the whole record, including Plaintiff's subjective complaints, and that the RFC was supported by substantial evidence.  (ECF Doc. 13, pp. 6-11.)

### 1. The ALJ's Failure to Consider the Entire Record Deprived the RFC of the Support of Substantial Evidence and Failed to Build a Logical Bridge

In support of his argument that the ALJ erred by failing to consider evidence supporting a greater degree of impairment, Mr. Burns asserts that the ALJ failed to address: evidence that his thoracic spinal infections were recurrent, with associated pain and functional limitations; evidence that permanent thoracic spinal damage caused by the recurrent infections exacerbated his lumbar impairments, requiring surgical intervention; and evidence connecting his objective diagnostic imaging and complicated medical history with his subjective complaints of pain. (ECF Doc. 11, pp. 14-21.)

The Commissioner responds that the ALJ sufficiently considered the record, explaining: "notwithstanding the October 2020 alleged onset date—the ALJ succinctly summarized th[e] earlier treatment history and, understandably, focused on the fact that the infections had resolved by March 2021."  (ECF Doc. 13, pp. 7-8.)  As to any permanent damage resulting from Mr. Burns's spinal infections, the Commissioner argues that "the decision shows consideration of Plaintiff's treatment, including back surgery, in the aftermath of the infections."  (*Id.* at p. 8.)

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in

[the] case record." 20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role

of a medical expert by assessing the medical and non-medical evidence before rendering a

residual functional capacity finding." *Poe*, 342 F. App'x at 157.

In support of his RFC findings, the ALJ provided the following discussion of Plaintiff's

medical treatment records:

> Records show the claimant spent six days in the hospital in February 2020 due to
> back pain caused by T8-9 discitis []. The T8-9 discitis with endplate destruction
> was shown on MRI reports dated February 21 and February 22, 2020 []. A PICC
> line was placed while the claimant was in the hospital to address the infection [].
> After eight weeks of antibiotics, the infection at T8-9 had resolved []. By July 2020,
> the claimant reported that his back pain levels had improved from a 10/10 to a 2/10
> []. An MRI of the thoracic spine dated March 22, 2021 showed no further abscess
> at T7-9 but did show some absent disc space at T8-9 []. While these findings do
> show disc changes in the thoracic spine, I note that the infection had resolved within
> a year of onset [].

> Diagnostic imaging have also shown significant changes to the lumbar spine. While
> the claimant was in the hospital in February 2020, MRI of the lumbar spine had
> shown very mild lower lumbar disc disease with no stenosis []. An updated MRI of
> the lumbar spine dated March 22, 2021 showed some worsening in the form of
> moderate lumbar stenosis at L4-5 with moderate foraminal stenosis []. The claimant
> ultimately would undergo an L4-5 laminectomy and fusion surgery on November
> 10, 2021 due to these shown changes in the lumbar spine []. I do note however that
> both before and after this surgery, clinical signs rarely corresponded in scope and
> degree with the symptoms the claimant reported. Twice in March 2021, the
> claimant presented with no signs of gait deficit, and with normal muscle strength
> in all of his extremities and joints []. On October 14, 2021 the claimant showed
> signs of a normal gait, full strength in the upper and lower extremities, and negative
> straight leg raise testing bilaterally []. The claimant's presentation was similarly
> normal on November 4, 2021 []. Subsequent to the November 2021 fusion, an
> examination dated February 1, 2022 showed normal gait and normal joint strength
> []. The claimant was advised to stop smoking cigarettes on that occasion, in order
> to help his fusion heal []. X-rays on this date showed no acute process in the lumbar
> spine, with the expected post-operative changes []. The claimant reported that the
> fusion surgery was helpful and that he no longer had leg pain []. No where in this
> longitudinal history did the claimant present with a cane to a medical appointment,
> being inconsistent with his testimony that he requires such for all ambulation,
> including when going to a doctor's appointment.

(Tr. 20 (citations omitted).)

With respect to Plaintiff's thoracic spine impairment, the ALJ recognized that Mr. Burns spent six days in the hospital for discitis (a bone infection) in February 2020, which resolved after eight weeks of antibiotics, after which the ALJ noted that Mr. Burns reported improved back pain in July 2020 and showed no further evidence of infection in a March 2021 MRI, but had some absent T8-T9 disc space.  (Tr. 20.)  But the ALJ did not acknowledge or address the following additional medical findings relating to Plaintiff's thoracic spine impairment:

- A June 2020 MRI that showed interval improvement of the discitis osteomyelitis at T8-T9, but new osteomyelitis at the spinous process of T7 and progression at the spinous process of T8 and T9 (Tr. 443);

- A September 2020 MRI that showed redemonstrated discitis osteomyelitis of the T8 and T9 vertebral bodies and disc space and severe height loss of the T8 and T9 vertebral bodies (Tr. 439-40);

- Continued complaints of back and leg pain in September and October 2020 (Tr. 421-23, 472-74) leading to a culture to assess the need for further antibiotics (Tr. 423);

- A culture showing a staph infection in October 2020, leading to an additional eight weeks of IV antibiotics (Tr. 418, 419);

- A January 2021 appointment where Plaintiff reported that he had completed the new eight-week course of antibiotics, and his back pain was improving (Tr. 413-14).

The Commissioner argues that the ALJ's "succinct" summary of the treatment records preceding the October 2020 alleged onset date was sufficient, and that the ALJ "understandably[] focused on the fact that the infections had resolved by March 2021."[3]  (ECF Doc. 13, p. 8.)  On the contrary, the Court finds the MRI evidence showing new and recurrent osteomyelitis in June and September 2020, a culture positive for staph infection in October 2020, and a new eight-week course of IV antibiotics completed by January 2021 are material elements of Plaintiff's treatment

---

[3] Although the Commissioner highlighted the fact that Plaintiff's alleged onset date was October 2020, he did not specifically argue that medical findings preceding the alleged onset date are not material.  Even if the Commissioner made such an argument, the Sixth Circuit has recognized that "evidence . . . predating the onset of disability, when evaluated in combination with later evidence, may help establish disability."  *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006).  Here, where the alleged impairment began with an acute event in February 2020, the Court finds that Plaintiff's treatment between the acute event and the alleged onset in October is material.

history for his thoracic spine impairments, and further finds that the ALJ's omission of all of this information from his summary—citing instead a single office visit where Plaintiff reported improved back pain—had the ultimate effect of mischaracterizing the treatment records.

As to Plaintiff's lumbar spine impairment, the ALJ's summary notes that a February 2020 MRI showed very mild lumbar disc disease with no stenosis, a March 2021 MRI showed some worsening with moderate lumbar and foraminal stenosis, and Plaintiff ultimately underwent an L4-5 laminectomy and fusion surgery in November 2021.  (Tr. 20.)  But the ALJ also states that Plaintiff's clinical signs before and after the surgery "rarely corresponded in scope and degree to the symptoms the claimant reported."  (*Id.*)  In support of this finding, the ALJ cites normal examination findings in March, October, and November 2021, and February 2022.  (*Id.*)  The ALJ also notes that lumbar x-rays in February 2022 showed no acute process with expected post-operative changes, and that Mr. Burns reported in February 2022 that the surgery was helpful, and he no longer had leg pain.  (*Id.*)  But the ALJ does not acknowledge or address the following additional records and findings relating to Plaintiff's lumbar spine impairment:

- A June 2020 neurosurgery office visit where Dr. Goel told Mr. Burns he was a candidate for a lumbar fusion "[d]ue to the angulation of his spine" from his thoracic spine discitis, with an option to "repeat scans in a couple of months to make sure that there isn't any[]more breakdown of his discs," with Mr. Burns electing to repeat scans in two months rather than proceed with surgery (Tr. 476);

- A September 2020 MRI showing interval increased spondylolisthesis of L4 relative to L5 and disc height loss, moderate central canal stenosis, and interval mild increased disc height loss at L3-L4 (Tr. 441-42);

- A September 2020 neurosurgery office visit where Mr. Burns reported difficulty and pain bending over and standing up straight and a hunched over posture, and Dr. Goel advised that this was "likely all his new normal," offered conservative measures including physical therapy and oral medications, prescribed pain medications, and again advised Mr. Burns that he was a candidate for fusion surgery with the "primary goal" being "to help his current symptoms from getting worse" (Tr. 471-72);

- An October 2020 neurosurgery office visit where Mr. Burns reported similar symptoms, but Dr. Goel advised that they could not move forward with lumbar fusion

23

surgery due to the PICC line in place for his staph infection and the reported need to treat with IV antibiotics for six weeks (Tr. 467);

- A March 2021 neurosurgery office visit where new imagery was ordered after Mr. Burns complained of low back pain when bending forward and said he felt like he was regressing since the removal of his PICC line two months prior (Tr. 461);

- Dr. Goel's interpretation of March 22, 2021 lumbar flexion-extension x-rays as showing "instability at the L4-L5 level, with a spondylolisthesis of 7mm in a neutral position which reduces to 3mm with extension" (Tr. 451);

- A March 2021 neurosurgery visit where Dr. Goel advised Plaintiff that new imagery confirmed no further evidence of spinal infection but showed that Mr. Burns required surgery with hardware, with the primary goal to "stop the current symptoms from getting worse" and a secondary goal of feeling better, and with a note that Mr. Burns would "likely have back pain and stiffness due to the hardware" (Tr. 456);

- An October 2021 neurosurgery visit where Mr. Burns complained of low back pain radiating into his legs, where Dr. Goel again noted that the primary goal of surgery was "to stop the current symptoms from getting worse," with a secondary goal of feeling better, and with "no way to know if he has permanent damage" (Tr. 451);

- An October 2022 neurosurgery visit where Mr. Burns complained of low back pain radiating down his left leg for the prior three months, was prescribed medications and advised to use his TENS unit, was told to hold off on physical therapy, and "was advised that if he requires a fusion at this time, it will start a domino effect and he will likely require further fusions in the future" (Tr. 718); and

- An October 2022 neurosurgery visit where Mr. Burns reported that medications did not help with his symptoms, and Dr. Goel referred him to pain management and discussed "in detail" the possibility of an intrathecal pain pump trial (Tr. 805).

In response to Plaintiff's argument that the ALJ failed to acknowledge the extent to which his thoracic spine infections "caused permanent and irreversible damage," the Commissioner argues that ALJ's decision "shows consideration of Plaintiff's treatment, including back surgery, in the aftermath of the infections." (ECF Doc. 13, p. 8.)  On the contrary, the Court finds the ALJ's summary of the lumbar treatment acknowledges only mild MRI findings in February 2020, moderate MRI findings in March 2021, and surgery in November 2022, with an emphasis on normal physical examination findings throughout that period that "rarely corresponded in scope and degree with the symptoms the claimant reported." (Tr. 20.)  There was no acknowledgement

24

of the imagery and neurosurgery treatment records identified above, which both illustrate the link between the damage caused by Plaintiff's discitis and the need for surgical intervention in the lumbar spine and provide objective findings and medical conclusions that potentially support the scope and degree to Plaintiff's reported symptoms.  The ALJ also did not acknowledge treatment records from October 2022 where Plaintiff reported worsening symptoms.  The Court finds that the ALJ's omission of all of the above information from his summary—citing only limited imagery, the surgery, normal physical exam findings, and one report of improved symptoms in February 2022—had the ultimate effect of mischaracterizing the treatment records.

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).  "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]"  *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

An ALJ need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  But he must perform "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record" to support his findings.  *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany-Johnson v. Comm'r of Soc. Sec.*,

25

313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports").  In other words, an ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).

Instead, the ALJ's explanation must "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877; *see id*. at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.") (citations omitted).  And an explanation premised on a mischaracterization may deprive the analysis of the support of substantial evidence.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (finding ALJ decision lacked the support of substantial evidence where the decision was premised on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support RFC after mischaracterizing evidence).

Here, the ALJ's omission of the objective findings and treatment records outlined above appears to minimize the severity of Plaintiff's spinal impairments and to diminish the seriousness and scope of his related medical treatments.  Further, it is unclear whether or how the ALJ factored the omitted evidence into his RFC analysis.  Did the ALJ fail to consider the additional imagery, treatment, and neurosurgical findings and recommendations?  Or did he consider them but find for unspecified reasons that they did not change his analysis?  Because it is not clear whether or how the ALJ factored the omitted records and findings into his decision, the Court finds the ALJ inadequately articulated his RFC analysis, failed to support the analysis with

substantial evidence, and failed to build "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

For the reasons set forth above, the Court finds that the ALJ's written decision does not clearly demonstrate that he considered the entire record and adequately articulated the basis for his RFC findings.  Accordingly, the Court finds that Plaintiff's assignment of error has merit and remands the ALJ's decision for further proceedings consistent with this Order.

### 2.     The ALJ Failed to Accurately and Completely Evaluate the Records Relevant to Plaintiff's Subjective Allegations of Pain

Given this Court's determination that remand is warranted for a more complete analysis of the medical evidence relevant to the RFC findings, it is not necessary to address Plaintiff's second argument, that the ALJ also did not adequately address the credibility of his complaints of pain.  Nevertheless, the Court finds a brief discussion of this argument to be appropriate.

An ALJ is required to evaluate the intensity and persistence of a claimant's symptoms to determine the extent to which they limited his ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49464; *Rogers*, 486 F.3d at 247 (citing 20 C.F.R. § 404.1529(a)).  That analysis "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Where the alleged symptom is pain, the ALJ should evaluate the severity of the pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c), including daily activities, types and effectiveness of medications, treatment to address symptoms, precipitating and aggravating factors, and other factors.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ acknowledged Plaintiff's complaints of back pain radiating into his legs, causing difficulty with standing, walking, lifting, and sleeping at night.  (Tr. 19.)  But he found Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were "inconsistent because the objective evidence indicates the claimant is capable of greater functioning than alleged."  (Tr. 20; *see also* Tr. 22 ("As discussed above, the claimant's allegations are somewhat inconsistent with what the objective evidence suggests in terms of functional restriction.").)  Thus, the ALJ focused on the objective medical findings in concluding that Plaintiff's allegations regarding his pain were inconsistent with the evidentiary record.

In support, the ALJ acknowledged some MRI and x-ray findings, one course of IV antibiotics, the lumbar surgery, and certain abnormal physical examination findings but also noted that Mr. Burns reported improved pain at two treatment visits and that the majority of his physical examination findings were normal.  (Tr. 20-22.)  But the ALJ did not acknowledge the records outlined above, which show: recurrent spinal infections, with associated complaints of pain and limitation; findings by Plaintiff's neurosurgeon that substantiate the significance of Plaintiff's lumbar impairment and emphasize its likely contribution to ongoing pain; treatment records showing recurrent complaints of pain, including complaints of worsening after prior reports of improvement; and treatment records demonstrating frequent use of medications to address pain, and recent referrals to consider more significant pain treatment.

Under the governing regulations, an ALJ should consider objective medical evidence "a useful indicator" of the intensity and persistence of a claimant's symptoms and the effect of the symptoms on his ability to work.  20 C.F.R. § 404.1529(c)(2).  But the regulations recognize that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. § 404.1529(c)(3).  Thus, an ALJ should "carefully consider

any other information [a claimant] may submit about [his] symptoms," *id.*, and may not reject statements about the intensity and persistence of the symptoms "solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. § 404.1529(c)(2).

In this case, the ALJ did not acknowledge much of the non-objective evidence relevant to the subjective symptom analysis, including repeated reports of pain and limitation to providers, provider notes indicating that ongoing pain is likely even with recommended interventions, ongoing use of medications to treat pain, and recent reports of worsening with referrals for more significant pain treatment. The ALJ also failed to acknowledge objective evidence that may have lent additional credence to Plaintiff's allegations of pain. In these circumstances, the Court concludes that the ALJ failed to support his subjective symptom analysis with substantial evidence, did not adequately articulate his analysis, and failed to build "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

For the reasons set forth above, the Court finds that the ALJ's written decision does not clearly demonstrate that he considered the entire record and adequately articulated the basis for his analysis of Plaintiff's subjective complaints of pain. Accordingly, the Court remands the decision for further proceedings consistent with this Order.

## VII.    Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should: consider the entire record, including both objective and non-objective evidence; accurately discuss the evidence; clearly articulate the rationale for both his RFC findings and subjective symptom analysis; and ensure that his stated rationale builds an accurate and logical bridge between the evidence and the result.

September 29, 2025

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge